SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


JASON M. SCHNITZMEYER,              )
      Plaintiff,                       )
                                    )
   vs.                              )              1:09-cv-0107-SEB-DML
                                    )
THE INDIANA RAIL ROAD COMPANY, )
NATIONAL STARCH & CHEMICAL        )
COMPANY, NATIONAL STARCH LLC,   )
and INDOPCO, INC.,                  )
      Defendant.                       )
                                    )


**ORDER ADDRESSING PENDING MOTIONS FOR SUMMARY JUDGMENT**


     Plaintiff, Jason M. Schnitzmeyer, was seriously injured while working as a

member of a crew responsible for rail car switching on the property of Indopco, Inc.,

which at the time did business under the name National Starch & Chemical Company.

Schnitzmeyer has brought this lawsuit naming as defendants:  Indopco, Inc., National

Starch & Chemical Company, and Indopco, Inc.'s successor in interest, National Starch

LLC (collectively "National Starch").  Schnitzmeyer includes The Indiana Rail Road

Company ("IRR") as a defendant as well, alleging that they all share responsibility for his

injuries.  All of these defendants have moved for summary judgment and, for the reasons

explicated in this entry, we find merit in IRR's motion, but conclude that National

Starch's motion must be denied because of unresolved material questions of fact.

**Factual Background**

IRR is a common carrier owned by an Indiana holding company, Midland United ("Midland"), which operates an interstate rail freight service that serves Indiana, Illinois and Kentucky.  Its business consists of picking up rail cars from customers and transporting the cars over IRR track to a consignee or to another rail carrier which takes over any further transportation of the car.  Once IRR delivers and releases the rail car to a consignee company, its obligations as the common carrier are complete and any further movement of the car within the consignee's facilities is the responsibility of the consignee.  Some customers use their own employees to move and switch rail cars within the boundaries of their facilities and others retain independent contractors to provide such services.  IRR has leased locomotives to its customers for purposes of on-site rail car movement by the customers' employees or third-party contractors, but it has never provided third-party contract switching services to its customers.

During the 1990s, Midland decided that there might be a business opportunity to provide various services that, although related to, were not services provided by a common carrier.  Accordingly, Midland incorporated Unified Services, Inc. ("Unified") as an Indiana corporation to act as a holding company for subsidiaries which would actually provide the non-common carrier services.  Unified incorporated two subsidiaries, Dependable Rail Services, Inc. ("DRS") to provide customers third-party switching services and Distribution Services, Inc. ("DSI") to perform what is referred to as trans-

load operations.

It is uncontested that Midland's expansion into areas other than common carrier services was the brainchild of IRR's upper management, several of whom served in official capacities with respect to all the Midland subsidiaries. In fact, because DRS was a small start-up company which had yet to acquire a foothold in the marketplace, in addition to sharing several officers with IRR, it purchased most of its administrative services (i.e. accounting, payroll, human resources) from IRR, and employed only those persons necessary to perform the contracted work. Thus, DRS was heavily dependent upon IRR's ability to provide, at a reasonable price, the various administrative and management services necessary to assist DRS in operating and growing its business. Over time, Unified hired certain individuals to market the services of DRS and DSI, but their success was very limited in that they secured only one long-term contract.

In early 2002, DRS submitted a successful low bid to provide third-party switching services to National Starch. Pursuant to the Switching Services Agreement executed between DRS and National Starch, DRS was to provide a supervisor/engineer and two two-men crews to perform rail car switching services at the National Starch facility, which included: picking up rail cars delivered to the plant by CSX Transportation (the common carrier which serviced National Starch) and moving them to locations within the National Starch facility; positioning outbound cars for pick-up by CSX Transportation; and moving and switching cars within the National Starch facility as directed by National

Starch.  DRS was to supply the locomotive necessary to execute the requirements of the Switching Services Agreement, which it did by leasing one from IRR.  The agreement was for a period of three years but was extended; indeed, the relationship lasted for more than five years.

At the request of National Starch, the first employees hired by DRS to fill the crew positions were employees who had worked for the previous third-party switching contractor and were familiar with the National Starch facility.  One of those employees, Patrick Fugate, eventually qualified to operate the locomotive and later became the DRS supervisor responsible for overseeing the switching crews and interacting with the National Starch bulk operations supervisor, J.T. Rusk, who provided DRS with day-to-day instructions regarding which rail cars needed to be moved to which locations within the facility.  Rusk would also observe work of DRS crews on occasion to make sure they were following safe work practices and staying in compliance with the written standards and procedures of the plant.

At the suggestion of a former co-worker, Josh Asa, the plaintiff, Jason Schnitzmeyer, went to the offices of IRR in April 2006 to apply for a crew position similar to the one Asa had been hired into after he left the moving company where they both had been employed.  Though the application form stated at the top that it was for employment with IRR, the letter Schnitzmeyer received a few days later offering him a job contingent upon passing a physical was from DRS.  Schnitzmeyer accepted the

position as an employee of DRS and passed the physical. Thereafter, at all relevant times Schnitzmeyer was assigned to the switch crew at the National Starch plant in Indianapolis.

As with all crew members, Schnitzmeyer checked-in for work each day at the DRS trailer located within the National Starch facility. He received instructions on which rail cars needed to be moved that day from Fugate or from John Holland, the next most senior DRS crew member who was also qualified to operate the locomotive. During his first week of employment, Schnitzmeyer rode the locomotive and shadowed Josh Asa on the ground crew to gain an understanding of the daily operations and the specialized language utilized by the crew to communicate via radio during the course of switching, coupling and decoupling rail cars. After his initial week of shadowing the others, Schnitzmeyer became a regular member of the ground crew. Schnitzmeyer claims in this litigation that he received no specific safety instructions other than a review of a daily safety rule that Fugate posted at the trailer which each crew member was required to read and certify to having read at the start of each work day. Though there was a DRS safety manual retained and available for review at the trailer, Schnitzmeyer maintains he never received or reviewed it.

Schnitzmeyer worked through the end of 2006 without incident. However, on February 26, 2007, he suffered an injury which eventually required the amputation of his right foot. The incident occurred when the crew he was working with was assigned to

couple and move two rail cars located near what was known as the feed shed on the National Starch property. The railroad track curves near that feed shed, which sometimes caused additional difficulty in aligning the cars placed there by National Starch for coupling, often necessitating multiple attempts to accomplish the final hook-up. Once coupled, the cars were moved to the outbound track for pick-up by CSX Transportation.

John Holland was the engineer responsible for operating the locomotive on the day Schnitzmeyer was injured. When coupling cars, he received direction via radio transmissions from crew members on the ground. The ground crew was responsible for aligning the coupling devices ("couplers") located on the ends of two adjoining rail cars, allowing them to engage when they were joined together. A coupler is a pivoting mechanism mounted on the ends of rail cars and, because it pivots, its lateral position can be adjusted so that it better mates with the coupler on the rail car with which it is attempting to connect. The crew member executing the coupling gives direction to the operator of the locomotive concerning when to move the locomotive backwards or forwards, and when to stop. John Fries, a member of the ground crew, coupled the locomotive into the first car, thereafter passing control of the locomotive movement to Schnitzmeyer to manage the coupling of the second car. Schnitzmeyer radioed Holland telling him to back up the locomotive in order to accomplish the coupling of the second railroad car. Their first attempt to couple the second car failed.

When the couplers on the cars failed to engage correctly, Schnitzmeyer instructed

Holland to pull the locomotive forward in preparation for a second coupling attempt. The locomotive pulled away as instructed and stopped, whereupon Schnitzmeyer walked between the cars and adjusted, by hand, the coupler on the car which was connected to the engine. After making the adjustment, Schnitzmeyer stepped out from between the cars and radioed Holland to move the locomotive toward the car to be coupled.

Holland put the locomotive in motion, but Schnitzmeyer perceived that the coupler on the car attached to the locomotive was still out of alignment. Without asking Holland to stop the locomotive, Schnitzmeyer walked between the car being pushed and the stationary car to which it was to be connected and, while balancing on his left leg, kicked the coupler on the moving car with his right foot at the point when the coupler was approximately a foot from making a connection. According to Schnitzmeyer, he and other crew members regularly performed this type of adjustment of a coupler when the situation required. As he stated in his deposition, "within the blink of an eye" his foot became caught between the two couplers as they met. He managed to extract his foot, falling to the ground screaming from the pain. Schnitzmeyer's coworkers heard him screaming and came immediately to his aid. They also notified National Starch personnel who dispatched the company's on-site emergency responders who called for an ambulance.

Schnitzmeyer's foot ultimately required amputation, for which injury Plaintiff seeks compensation in this lawsuit. He retained counsel to assist him with his claims.

His medical bills and workers compensation benefits were paid by DRS and a settlement was reached which included a payment to Schnitzmeyer to compensate him for his permanent partial disability in accordance with Indiana Workers Compensation laws. Schnitzmeyer filed this lawsuit under the Federal Employers' Liability Act (FELA) against IRR and also seeks to recover on his claim of common law negligence against both IRR and National Starch. IRR and National Starch have filed respective motions seeking summary judgment in their favor.

## Summary Judgment Standard

Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion should be granted so long as no rational fact-finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both instances is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. In ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id*. at 255. If the nonmoving party bears the

burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.1999). The moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## Discussion

### *FELA Claim*

In enacting FELA, Congress provided a federal tort remedy specifically tailored to railroad workers injured while working for a common carrier. In relevant part, FELA provides:

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damage to any person suffering injury while he is employed by such carrier in such commerce, ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier ....

45 U.S.C. § 51. DRS is not a common carrier, but IRR is. Hence, Plaintiff seeks to prove that he was a "dual-servant" of DRS and IRR, which status would allow him to recover under FELA against IRR, despite the fact that he was on the payroll of DRS. *See Kelley v. Southern Pac. Co.,* 419 U.S. 318, 324-25 (1974).

In assessing whether an employee is a "loaned-servant," trying to determine which party had the right to control the work performed by the employee is the primary issue.

*Id.*; *see also, Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1349 (3rd Cir. 1991). Plaintiff offers no evidence to establish that IRR had control over his work activities. In fact, there is no evidence that IRR was involved in any fashion in the daily work activities at the National Starch facility, beyond having leased the locomotive engine to DRS.

Plaintiff attempts to make much of the fact that DRS shared officers with and drew substantial administrative and management support from IRR. However, even such a close relationship as that fails to establish that IRR controlled the details of Plaintiff's work. Where corporate formalities are substantially observed, as is true here, subsidiary companies are separate entities and the acts of one are not attributed to the other. *See Central States, Southeast and Southwest Areas v. Reimer Express World Corp.,* 230 F.3d 934, 944 (7th Cir. 2000). Schnitzmeyer has adduced no evidence to show that DRS failed to pay for the administrative support it received from IRR and, contrary to the insinuations of Plaintiff, there is nothing sinister or improper about the owners of a common carrier starting up a separate company to engage in business opportunities beyond the services typically performed by a common carrier and maintaining each company's independence by requiring the start-up company to pay for any required administrative or management services from its more well-established affiliate. Furthermore, Schnitzmeyer admits that his day-to-day activities were directed by Fugate, a DRS employee, from whom he and his crew received their daily assignments based upon the car movement requests Fugate received from J.T. Rusk of National Starch. The

evidence thus clearly establishes that IRR played no role in the supervision of Plaintiff's work, on the day in question or any other.  Consequently, IRR is entitled to summary judgment on Plaintiff's FELA claim.

**Negligence Claims**

A common law negligence claim under Indiana law requires a plaintiff to prove: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Peters v. Forster,* 804 N.E.2d 736, 738 (Ind. 2004).  Whether the law imposes a duty upon a defendant with respect to its conduct toward a plaintiff is a question of law for the court to resolve.  *Northern Indiana Public Service Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003).  If no duty exists, summary judgment in favor of the defendant is appropriate.  *A.S. v. LaPorte Regional Health System, Inc.*, 921 N.E.2d 853 (Ind. App. 2010).

*IRR's Alleged Negligence:*

IRR claims, as a matter of law, that it owed no duty to Plaintiff.  IRR was not his employer and he was not performing work on IRR's behalf or for its benefit. Schnitzmeyer maintains that IRR assumed a duty to provide him with a safe workplace and that the issue of whether a duty was assumed by IRR is a question of fact for a jury to

decide. The facts upon which Plaintiff bases his claim that IRR assumed a duty to provide a safe workplace include: its ownership of the locomotive, the occasional visits to the National Starch facility by IRR trainmaster Ed Wilson and IRR Vice President Dave Long, and Fugate's deposition testimony stating that he and Holland both received their locomotive operator certifications from Wilson and thus typically deferred to Wilson's directions and judgment, were he to provide instruction with respect to safe operations.

We note again that it is uncontested that DRS purchased administrative services from IRR, and that various IRR employees provided these services as needed. Accordingly, to that extent there was a contractual relationship between the two companies which, if conduct or contract warranted, might have created a special relationship between them and a corresponding duty to act prudently. *Smith v. King,* 902 N.E.2d 878, 883 (Ind. App. 2009). Typically, whether a party's conduct resulted in an assumption of duty toward another is a question for the trier of fact, but where the record contains no basis on which to establish that a duty was so assumed, the court can make that determination as a matter of law. *Id.* That is the situation here.

First, IRR's ownership of a locomotive that was leased by DRS or IRR's certification of Wilson and Holland as operators of the locomotive do not give rise to an obligation on the part of IRR to assure that DRS employees were provided a safe place to work. There is no allegation that Holland operated the locomotive in an unsafe manner.

-13-

Nor would any IRR employee's visit to the National Starch premises in connection with providing maintenance to that locomotive give rise to any duty owed to a DRS employee to assure that the railroad tracks at the National Starch facility had sufficient ballast or drainage to provide safe footing. The weakness of Plaintiff's logic is obvious when applied to an analogous situation in which a hardware store might rent a person a spade for a weekend of gardening, but in so doing would not become responsible for assuring that the footing was adequate at the place the user pushed the spade into the ground or for making sure that the necessary pressure for inserting the shovel in the soil was not being applied by the gardener's bare feet.

Plaintiff claims that IRR employees' attendance at meetings at National Starch where safety was a topic of discussion suffices as evidence of IRR's assumption of a duty to ensure safe conditions for DRS employees. At his deposition, Wilson testified that he had visited the National Starch facility on only a few occasions to investigate a specific derailment to determine if it involved or damaged the leased IRR locomotive, and to attend general purpose meetings convened by National Starch for the purpose of determining if any of the parties involved in the rail car switching process had any problems, questions or issues that needed to be addressed. Though issues of safety may have been discussed, he had no specific recollection of such. Wilson also testified that on occasion he would make courtesy visits to the DRS trailer to see if everything was going smoothly and to assure that the locomotive was running properly, but he never used these

stop-by visits for the purpose of inquiring into how the switching or coupling operations were being performed.

Plaintiff's assertion that Fugate's practice was to some extent to defer to Wilson's knowledge and experience and his judgment as to safety procedures was premised on a convoluted but ultimately irrelevant series of hypothetical questions posed to Fugate during his deposition regarding how he might respond if Wilson were to have come to the site and offered comments on how things were being done. Fugate's response was that he would likely have heeded Wilson's directions or possibly convened a crew meeting regarding any suggestions Wilson might offer, but in any event he would need more information before he could be certain about how he would react. This evidence, if you can even call it that, hardly proves that IRR's Wilson assumed responsibility of safety to a degree that a duty of care in that regard was created.

Dave Long testified at his deposition that he helped DRS with the bid for the National Starch contract and with negotiations of the renewal contract. He visited the National Starch facility no more than, on average, a couple times a year, usually at the request of J.T.Rusk or Anne Trent of National Starch, and occasionally just "to see how the DRS folks were doing." Long performed marketing responsibilities for IRR and, when contracted for, with DRS as well. When working on behalf of DRS, he sought to assure customer satisfaction; in terms of the day-to-day procedures utilized by the switching crew he had little knowledge. His visits to National Starch were always brief,

and he did not recall participating in any safety discussions regarding the work at National Starch.

To the extent that IRR was an independent contractor providing DRS, who was Plaintiff's employer, with administrative or management services through IRR's employees, such as Wilson, Long or others, IRR had no independent duty to keep DRS employees safe. No evidence in the record supports a finding that the services DRS received from IRR included providing safety training or safety monitoring for its switching crews. Indeed, Schnitzmeyer makes clear in his deposition that he took directions from Fugate, a DRS employee, who was responsible for the training and safety of the switching crew. Beyond Fugate, the only person even arguably responsible for the safety of the switching operations was J.T. Rusk of National Starch, who would from time to time hold safety meetings or provide oversight of safety concerns or risks on the National Starch premises. Accordingly, there being insufficient evidence to support a negligence claim against IRR based upon the assumption of a duty by it to Schnitzmeyer, summary judgment on this issue must enter in favor of IRR.

*National Starch's Alleged Negligence:*

In terms of the switch crew's day-to-day activities, the relationship between DRS and National Starch is more problematic than DRS's relationship with IRR. National Starch contracted with DRS as an independent contractor to provide rail car moving

services on National Starch property. Plaintiff contends that in so doing National Starch assumed a duty for overall safety of the employees on the job and that it failed to meet that duty, which negligence was a proximate cause of his injuries. More specifically, Schnitzmeyer maintains that rail cars designated for coupling by National Starch should not have been placed by National Starch on the curved portion of the track, and further, that National Starch did nothing to alleviate the muddy conditions along the track and also failed to provide him with appropriate safety instruction or training. In support of its motion for summary judgment, National Starch argues that it assumed no duty to Schnitzmeyer and neither the curvature of the track nor the conditions along side it contributed to the accident; rather, Schnitzmeyer's decision to ignore the obvious dangers associated with kicking a coupler on a moving rail car was the sole cause of his injuries and, in any event, if there were other causes, his own voluntary actions accounted for more than 50% of any fault that could be assigned in this case.

Again, we begin our analysis by considering whether National Starch assumed any duty towards Plaintiff, because, as a general rule, unless an obligation is assumed, a property owner owes no duty to an employee of an independent contractor with regard to safe working conditions other than to maintain the property in a reasonably safe condition. *Daisy v. Roach,* 811 N.E.2d 862, 866 (Ind. App. 2004). In contrast to the circumstances relating to IRR, some evidence does exist that National Starch had taken certain steps to assure the safety of those involved in the rail car switching process.

Apparently, J.T. Rusk, National Starch's logistics coordinator, walked the tracks at least monthly to ensure that DRS employees were performing their jobs in a safe manner and to identify any unsafe conditions. Despite the fact that the contract bid documents required a DRS supervisor to participate in such safety walks, Rusk apparently made his tours alone. National Starch also required DRS employees to attend annual safety training courses presented by National Starch for all contractors at the facility. Rusk was also the contact point for employees of contractors to report hazardous conditions around the tracks, though the actual inspection and repair of the tracks was the responsibility of another outside contractor.

National Starch responds by noting that the contract with DRS required DRS to assume primary safety responsibilities with regard to its switching services by adopting and issuing rules for safe operations within the National Starch facility (which DRS did[1]) and that any safety meetings held or actions taken by Rusk with regard to safety were intended to assure that the operations of DRS posed no hazards to National Starch employees. Nevertheless, when asked at his deposition whether he would have taken any action if during one of his walks around the rail yard he would have seen a DRS crew

---

[1]As previously noted, DRS did adopt safety rules which were contained in a manual that was kept in the DRS trailer at the National Starch facility. Several of the rules in the manual make it clear that a crew member is not to enter between cars while the coupling process is in progress and there is a rule specifically forbidding the adjustment of the knuckle of a coupler by use of hand or foot while cars or the engine are in motion. One rule, which was posted on the DRS trailer bulletin board for a week as a particular "safety focus" and which Plaintiff acknowledged reviewing stated: "Before going between equipment, notify engineer and wait for response that he acknowledged the notification."

member kicking the coupler on a car, Rusk answered that he would have attempted to stop the DRS employee from doing so because that maneuver would not have been a safe way in which to adjust the coupler. Thus, at least to this extent, Rusk, acting on behalf of National Starch, arguably assumed a duty to maintain safe working conditions.

National Starch offers additional evidence to support its contention that it assumed no safety duty with respect to the DRS operations, but, as we noted previously, unless there is a total lack of evidence in support of the contention that a duty was assumed, the facts must go to a jury for resolution. *Smith v. King,* 902 N.E.2d 878, 883 (Ind. App. 2009). We think, despite some obvious weaknesses in this proof, Plaintiff has put forth enough evidence to overcome this minimal threshold.

Regarding the plaintiff's evidence of proximate cause, it should be noted that the law permits liability to be established on the basis of more than one proximate cause of an injury. Whether a particular alleged negligent act sufficed as a proximate cause of an injury is ordinarily an issue left to a jury to decide. *Hellums v. Raber*, 853 N.E.2d 143, 146 (Ind. App. 2006). National Starch contends that no evidence exists here to support a finding that the condition of its premises was a proximate cause of Schnitzmeyer's injury. Even if there were evidence to support such a finding or to establish that National Starch breached an assumed duty to train Plaintiff with regard to safe coupling operations, his decision to ignore a known and obvious danger by using his foot to adjust the coupler on a moving rail car constituted more than 50% of the fault for his injuries as a matter of law,

referencing Indiana's comparative fault statute that bars a plaintiff from recovering if he is more than 50% at fault.  Ind. Code § 34-51-2-6.

National Starch cites *Coffman v. PSI Energy,* 815 N.E.2d 522 (Ind. App. 2004) for the proposition that summary judgment is appropriate where the evidence overwhelmingly shows that a plaintiff's decision to incur a risk made him contributorily negligent to a greater degree than any fault assignable to the acts of others.  In *Coffman*, the plaintiff truck driver admittedly was paying no attention to what was above him as he mechanically raised a tarp over his trailer which had just been filled with refuse.  *Id*. at 525.  Despite his awareness that power lines were in the area from having picked up refuse from this customer in the past and though he had previously been involved in an incident where his trailer had been raised too high and had come into contact with power lines, the truck driver in *Coffman* continued to raise the tarp over his trailer until it came into contact with power lines which sent over 65,000 volts of electricity through the truck and threw him ten feet into the air.  *Id*. at 525-528.  In a majority decision, the Indiana Court of Appeals affirmed the trial court's grant of summary judgment in favor of several defendants, including the power company, the landowner and tarp manufacturer, finding that, under these circumstances, there could be no dispute that the plaintiff was more than 50% at fault.  *Id.* at 529.

National Starch also invokes the Indiana Court of Appeals holding in *Daisy v. Roach,* 811 N.E.2d 862 (Ind. App. 2004), in which the court ruled that while naturally

occurring winter conditions (not unlike those described to exist at the time of Schnitzmeyer's injury) may have contributed to the accident, they were not a proximate cause of the accident. In *Daisy,* an employee of an independent contractor sued a homeowner who was acting as his own general contractor when the employee was injured after falling from a ladder which had slipped on the ice that had accumulated on the ground. *Id.* at 864. The Court of Appeals affirmed the grant of summary judgment in favor of the homeowner because the independent contractor was found to have had control over the ladder and the failure to safely secure it which, as opposed to the wintry conditions, was the proximate cause of the accident. *Id.* at 866. The homeowner escaped liability because he had no control over the manner in which the ladder was used or placed. *Id.*

Schnitzmeyer attempts to distinguish these holdings by pointing out that National Starch controlled the initial placement of the rail cars that it wanted coupled and moved by DRS, and it controlled whether sufficient ballast and drainage existed in and around the rail tracks. Plaintiff also cites a more recent Indiana Supreme Court decision, *Estate of Mintz v. Connecticut General Life Ins. Co.,* 905 N.E.2d 994 (Ind. 2009), which reversed a trial court's grant of summary judgment in favor of a defendant insurance agent whose role was limited to having serviced the insurance needs of a University which employed the estate's decedent. In *Estate of Mintz,* the plaintiff estate sought to recover for a loss of insurance coverage which allegedly resulted from a negligent verbal

assurance by the agent that he would "take care of everything" in connection with the decedent's efforts to convert a group policy benefit into an individual policy at the time of the decedent's retirement. *Id*. at 996-97. On the basis of that assurance, the decedent and his wife failed to respond to a notice received from the insurer outlining additional steps necessary to secure the conversion of part of his coverage. *Id.* at 997. The trial court granted summary judgment in favor of the agent on the grounds that his advice was not the proximate cause of the loss of insurance coverage, and the Court of Appeals affirmed. *Id.* at 999. However, the Indiana Supreme Court, noting that an injury can flow from more than one proximate cause, reversed the grant of summary judgment on the grounds that, in a comparative fault system, proximate cause is particularly fact sensitive and best left to the fact-finder to resolve. *Id.*

In the case before us, there is no question that Schnitzmeyer's own negligence contributed significantly to his injury. Mindful of the Indiana Supreme Court's admonishment in *Estate of Mintz*, however, we cannot definitively determine that Schnitzmeyer's actions accounted for more than 50% of the fault leading up to his injuries. If a jury finds that National Starch assumed the responsibility for providing more than its general duty as a landowner to assure that its premises were in a reasonably safe condition and failed in that duty, *see Daisy*, 811 N.E.2d at 866, it could find that Schnitzmeyer's negligence did not amount to more than 50% of the allocable fault. Accordingly, summary judgment cannot be entered in National Starch's favor on these

disciputed facts.[2]

## **Conclusion**

Plaintiff , who was not an employee of IRR, has failed to adduce any evidence to support a finding that IRR assumed any duty with regard to his safety on the job. Accordingly, IRR's Motion for Summary Judgment (Doc. #57) is GRANTED.   Material questions of fact remain with respect to Plaintiff's claim that National Starch assumed a duty to assure safety in the conducting of coupling and switching procedures by DRS employees and then breached that duty, thus causing Plaintiff's injuries.  Consequently, National Starch's Motion for Summary Judgment (Doc. #52) is DENIED.

IT IS SO ORDERED.

Date:   01/28/2011

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

_____

[2]In responding to National Starch's Motion for Summary Judgment, Plaintiff maintained that the company had assumed a duty to assure that the coupling process was accomplished safely and seemed to abandon any argument that as a landowner National Starch had failed to keep its premises in a reasonably safe condition for the employees of an independent contractor. Regardless of whether Plaintiff intended to abandon such a contention, the facts are clear here that, as a matter of law, unless some greater duty was assumed by National Starch, the premises were in a reasonably safe condition.  Schnitzmeyer's own testimony makes it clear that, while conditions may have been wet and muddy that day, they were neither extraordinary nor unusual for that time of year and that he had often safely worked under such conditions.

Michael A. Bergin
FROST BROWN TODD LLC
mbergin@locke.com

Craig Wynn Church
HOEY & FARINA
cchurch@hoeyfarina.com

Darren Andrew Craig
FROST BROWN TODD LLC
dcraig@fbtlaw.com

James A. Fletcher
FLETCHER & SIPPEL LLC
jfletcher@fletcher-sippel.com

Kristin M. Liddle
FLETCHER & SIPPEL LLC
kliddle@fletcher-sippel.com